UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ESTATE OF JOSE ANGEL FELIPE ) <br> NIEVES, Deceased, by ANGELICA ) <br> NIEVES, Independent Administrator, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> CITY OF CHICAGO and City of Chicago ) <br> Police Officer LOWELL HOUSER, ) <br> ) <br> Defendants. ) | No. 17 C 00088 <br><br> Honorable Matthew F. Kennelly <br><br> Magistrate Judge Sheila M. Finnegan <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF CHICAGO'S
MOTION TO STRUCTURE DISCOVERY**

Plaintiff Angelica Nieves, as Independent Administrator of the Estate of Jose Angel Felipe Nieves, by and through her attorneys, in response to "Defendant City of Chicago's Motion to Structure Discovery" (Dkt. 109), states as follows:

## I.   INTRODUCTION

Defendant City of Chicago's ("City") motion rests on an entirely false premise: that a hypothetical ruling in a pending Seventh Circuit case – *First Midwest Bank v. City of Chicago,* 18-3049 (7th Cir.) – may dispose of Plaintiff's case. In fact, *First Midwest Bank* involves distinct facts and theories of liability from those which Plaintiff is pursuing here, and its utility will be limited. Here, Plaintiff is pursing two alternative theories against the City relating to the shooting death of Jose Nieves ("Decedent") by Officer Lowell Houser: (1) that Officer Houser was operating "under color of law" when he shot and killed Decedent, and (2) that the City created and/or increased a danger to Decedent that caused his death – i.e. a "state created danger" theory. Importantly, a "state created danger theory" was neither pursued in *First Midwest Bank* nor, tellingly, mentioned in the

1

City's Motion.[1] The City's failure to even address that theory dictates that its request be rejected.

Despite the City's strained efforts to hide behind euphemisms such as a "stay", "structure" and "prioritize," at bottom, the City's Motion seeks to bifurcate Plaintiff's *Monell* case – a procedure which is heavily disfavored in this jurisdiction. *Ricardo Rodriguez v. City of Chicago*, No. 18-cv-7951, 2019 WL 4278501, at *1 (N.D. Ill. Sept. 10, 2019) ("The last ten years of bifurcation jurisprudence in the Seventh Circuit demonstrates that 'it is clear that the weight of authority holds that bifurcation is now heavily disfavored'" in *Monell* cases). The City's request should be similarly rejected as its proposed "structure" will breed inefficiency as there will inevitably be overlap between Plaintiff's *Monell* discovery and the discovery the City seeks to "prioritize" leading to serial disputes about whether a given request is "*Monell* discovery" or relevant to "scope/color of law" issues.

In sum, this Court should deny the City's request because it relies on a hypothetical ruling in a factually and legally distinguishable case, wholesale ignores Plaintiff's state-created danger theory, and would only serve to complicate and delay inevitable discovery.

---

[1] There is no excuse for the City blinding itself to this argument. Plaintiff has repeatedly notified the City of its alternative theories. *See, e.g.,* Joint Status Report, Dkt. 93 ("As to *Monell*, Plaintiff will pursue two alternative theories relating to the violation of Decedent's constitutional rights…(2) there is liability upon the City because the City engaged in misconduct that created or increased the danger to Decedent"), ("City anticipates moving for summary judgment on . . 'any failure to protect' claim or 'created or increased danger' claim that may be asserted on Plaintiff"), ("Plaintiff pursues two alternative *Monell* theories, one of which – state created danger – was not even litigated in *First Midwest Bank*); Plaintiff's First Supplemental Answers to Defendant City of Chicago's First Set of Interrogatory No. 17, Ex. A ("Defendant City of Chicago created and increased the specific danger that ultimately caused Jose Nieves' death . . ."); *Alioto v. Town of* Lisbon, 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery"); *McDonald v. Household Intern, Inc.*, 425 F.3d 424, 427 (7th Cir. 2005) ("This court has repeatedly held pleaders in a notice system do not have any legal obligation to plead legal theories").

## II.     BACKGROUND

### A.     The City's Fostering of Officer Houser's Violence.

The City employed Officer Houser and empowered him with unfettered authority for decades. Prior to Officer Houser murdering Decedent, the City received and sustained[2] a deluge of complaints about Officer Houser's pushing, slapping, dragging, choking and threatening to kill several people in separate instances; "maltreatment and disrespect of person while off-duty"; repeated "aggressive" behavior; use of service weapon contrary to department policy; destruction of private property; lying to the City; unprofessional conduct; inconsistent work performance; use of police power "outside his responsibility" and violating citizen's constitutional rights. The City's files are replete with warnings that Officer Houser exhibited "anger management problems", "homicidal thoughts", "unusual and odd behavior on a consistent basis when dealing with the public and other department members" and that Officer Houser was "extremely bitter", "emotionally disturbed" and "harboring a significant amount of anger." Rather than strip Officer Houser of his police power, the City issued proverbial slaps on the wrists for at least five separate abbreviated or reduced suspensions.[3] Despite the City likewise repeatedly finding Houser unfit for duty and positing that "Houser may not even be suited to the occupation of police officer,"

---

[2] The United States Department of Justice Civil Rights Division and United States Attorney's Office Northern District of Illinois findings on January 13, 2017 ("DOJ Report") – eleven days after the murder of Decedent – detailed that in the five years preceding its investigation the City sustained fewer than 2% of all complaints of police misconduct. Moreover, the Police Accountability Task Force Report of April 2016 ("PATF Report") found that excessive force complaints were sustained in "only 1.4% of cases." Here, there were many other claims brought forward against Officer Houser that the City refused to sustain.

[3] The City's treatment of Houser illustrates the maladies diagnosed in the DOJ and PATF Reports, which respectively found that "[i]n the rare instances when complaints of misconduct are sustained, we found that discipline is haphazard and unpredictable, and is metered out in a way that does little to deter misconduct" and "[e]xisting policies and the woefully inadequate oversight regarding how discipline is imposed have allowed far too many officers to receive little or no discipline even after a complaint is sustained."

3

Officer Houser continued on as a gun-wielding employee cloaked in the authority of the City.

### B. The Defendants' Wrongful Conduct on December 11, 2016.

Officer Houser remained an employee of the City in possession of his badge, gun, ammunition and holster. On December 11, 2016, at a small residential building at 2525 N. Lowell Avenue, Officer Houser wielded the same gun filled with the same ammunition that he used when on assignment for the City. Officer Houser identified himself as a police officer and used this weapon to threaten the life of Decedent – an account that several individuals confirmed.

The police officers who arrived on scene ignored Decedent's reporting of the wrongful conduct. Not to be deterred, Decedent called the police back and requested that a supervisor return to address Officer Houser's threats. Despite Decedent supplying the City with the information that the black male police officer who threatened him came out of one of the two apartments on the first floor of the building, the City's investigative records fail to reference Officer Houser and instead dedicate an inordinate amount of effort attacking Decedent[4]. The City's silence is especially concerning given that Officer Houser's girlfriend and her son confirmed that the police on scene interviewed Officer Houser who identified himself as a police officer. Despite this, the City closed the investigation less than 24 hours after the incident and concluded that the incident was a "possible police impersonation." In sum, the City knowingly allowed Officer Houser to remain unscathed after brandishing a weapon and threatening the life of Decedent.

---

[4] An oft-used page from the City's playbook; the DOJ Report detailed the pattern where "the interview centered more on what the subject did to justify the officer taking action at all, rather than the circumstances of the use of force itself" and "a consistent unwillingness to prove or challenge officer's accounts of the incident, even when these accounts were inconsistent with physical evidence, credibly eyewitness statements, or common sense."

    **C.    The Murder of Decedent on January 2, 2017.**

On January 2, 2017, three weeks later and feet away from the original crime, Officer Houser brandished the same gun from his same holster[5], filled with the same ammunition[6], identified himself as a Chicago Police Officer and shot and killed Decedent. Officer Houser then called 9-1-1 and identified himself as "Officer Houser." When the police arrived on scene, Houser flashed his badge identifying himself as a police officer.[7] For the entirety of that day, the City and its more than 70 responding officers treated and documented the Decedent as the "offender," justifying Officer Houser's murderous actions as being in the interest of crime prevention.

### III.    ARGUMENT

To be liable under 42 U.S.C. § 1983, a defendant must have (a) violated a constitutional right while (b) acting under color of state law. *Moss v. Singleton*, 110 F. Supp. 3d 876, 881–82 (N.D. Ill. 2015). There is also a state-created danger theory under which public entities are liable "when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Buchanan–Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (quoting *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)). Plaintiff is pursing both theories, and as such, the City's request to structure discovery is incomplete, misplaced, and should be rejected.

---

[5] An officer interviewed by IPRA confirmed that Houser was using an "on-duty type holster."

[6] The City's Tactical Response Report identified ammunition as "Department Issued."

[7] In the criminal trial, counsel for Officer Houser contended that Officer Houser also showed his badge prior to the shooting in order to diffuse and de-escalate the situation.

5

> **A.   The City's Basis for Structuring Discovery Improperly Relies on a Hypothetical Seventh Circuit Opinion for a Factually and Legally Distinguishable Matter.**

The City argues for the structure of discovery merely because the pending *First Midwest Bank* matter relates to an off-duty police officer's misconduct. In the City's own words, in *First Midwest Bank,* "[defendant], an off-duty police officer, went out drinking with his friend [plaintiff]. The two got into an argument back at [defendant's] apartment about [plaintiff's] dog, and [defendant] shot [plaintiff']." (City's Appellant Brief in *First Midwest Bank*, Dkt. No. 26, at 9). Here, the City contends that "[i]f *First Midwest Bank* is decided in the City's favor and if Houser did not act within the scope of employment and under color of law, the City will not be subject to liability under *Monell* and the case could effectively be over." (Dkt. 93, at 2).

This is simply not true. As the City is well aware from the very oral argument it attaches to its Motion, (Dkt. 109-2), there are several factual and legal distinctions between the case presented here and those presented in *First Midwest Bank* – two of which are so fundamental that the utility of *First Midwest Bank* is speculative at best: (1) the plaintiff in *First Midwest Bank* <u>conceded</u> that the off-duty officer was <u>not</u> acting under the color of law (Dkt. 109-2, at 4:11-4:13; 49:4-49:5); and (2) a state created danger theory was not pursued. (*Id.*, at 5:20-6:10). Both of those factors are inapposite to the issues presented here and both go to the heart of *this* case. Thus, *First Midwest Bank* will not be dispositive for the City here, and there is simply no basis to conclude that a decision to-be-determined should dictate the structure for this case.

> **1.   <u>Whether Officer Houser operated under the color of law is a question of fact and should not delay *Monell* discovery.</u>**

As the City concedes in its Motion, the plaintiff in *First Midwest Bank* did not dispute that the defendant off-duty police officer was engaged in private conduct and not under the color of law. (Dkt. 109, at 8). That is not the case here. Here, fact and law support the notion that Officer

Houser was acting under color of law, and as such, related *Monell* discovery is necessary regardless of *First Midwest Bank*.

Despite the City's implications to the contrary, whether an officer was on-duty or off-duty at the time of the alleged constitutional violation is <u>not</u> dispositive as to whether he was acting under color of law. *Gibson v. City of Chicago*, 910 F.2d 1510, 1516 n. 10 (7th Cir. 1990)("[i]t is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law."). Just because an officer is on-duty does not mean he has acted under color of law. *Williams v. Farmer*, No. 12 C 01663, 2013 WL 1156426, at *3 (N.D. Ill. March 20, 2013). Conversely, an officer may be found to have acted under color of law even if he is off-duty. *United States v. Christian*, 342 F.3d 744, 751 (7th Cir. 2003). In making the determination of whether a specific officer operated under the color of law, courts must look to the officer's actions. *Chavez v. Guerrero*, 465 F. Supp. 2d 864, 869 (N.D. Ill. 2006); *Coles v. City of Chicago*, 361 F. Supp. 2d 740 (N.D. Ill. 2005)(holding that the presence of various factors may weigh in favor of a showing that an *off-duty* officer acted under the color of law, and that a jury is often charged with making such a factual determination); *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 n.5 (7th Cir.1995) ("Deciding whether a police officer acted under color of state law should turn largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties"); *Gibson* 910 F.2d, at 1517 n.2 (the Seventh Circuit has noted that "the issue of whether an person acted under color of law may present a jury question if there remain unanswered questions of fact regarding the proper characterization of the actions").

Here, Plaintiff already has evidence that Officer Houser engaged in a variety of actions which courts in this jurisdiction have found to be potentially persuasive in determining that off-

7

duty police officers operated under the color of law. First, Officer Houser identified himself as a Chicago police officer and attempted to deescalate the situation by stating, "I'm not about violence" before shooting and killing Decedent. *See Pesek v. Marzullo*, 566 F. Supp. 2d 834 (N.D. Ill. 2008)(finding a triable question of fact as to whether an off-duty police officer was acting under the color of law during an altercation with a restaurant patron and emphasizing that the officer testified to trying to "keep the peace" – i.e. deescalate the situation). Second, Officer Houser pulled the same gun he used while on assignment with the Chicago Police Department, from his on-duty holster, before firing Chicago Police Department issued ammunition. Third, Officer Houser called 9-1-1 and – again – identified himself as "Officer Houser." Fourth, when the police arrived on scene, Officer Houser flashed his badge yet again identifying himself as a Chicago Police Officer. *See Migut v. Chuse*, 86 C 4301, 1988 WL 128699 (N.D. Ill. 1988)(a reasonable jury could find off-duty officer was acting under color of law because he identified himself to plaintiff as a police officer, used his service weapon to shoot and seriously injure plaintiff, and remained on the scene and displayed his police identification to the responding police officers). Fifth, throughout the City's initial investigation into the subject incident, Decedent was referred to as "the offender." *Kindred v. Hilt-Dyson*, 94 C 4377, 1995 WL 250417 (N.D. Ill. April 27, 1995)(holding question for jury whether off-duty officer in civilian clothes was operating under the color of law emphasizing (1) that the off-duty officer immediately identified himself as an officer after the shooting and (2) that when completing the police report following the incident, the officer referred to the plaintiff as an "offender," suggesting that the officer believed the plaintiff had a committed a criminal offense that precipitated the shooting).

In sum, the issue of whether an off-duty police officer operated under of color of law requires a comprehensive case-specific factual analysis which was not done in *First Midwest Bank*

8

because plaintiff conceded that the off-duty officer was not operating under color of law. Thus, regardless of what the Seventh Circuit eventually holds in *First Midwest Bank,* the issue of whether Officer Houser was operating under color of law will still be at issue here, will necessitate discovery, and will likely need to be decided by a jury.

> **2. The City's request to structure discovery ignores Plaintiff's state created danger theory which will require *Monell* discovery regardless of whether Officer Houser was operating under color of law.**

Plaintiff is pursuing a state created danger theory – a theory that finds significant support even without the benefit of a full record. The state-created danger theory provides that plaintiffs may state claims for civil rights violations where state action "creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger that they otherwise would have been." *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993). In order to prevail under the state-created danger doctrine, there are three elements which a plaintiff must prove: (1) the state by its affirmative acts created or increased a danger to plaintiff, (2) the state's failure to protect plaintiff from danger that was the proximate cause of plaintiff's injury and (3) the state's failure to protect plaintiff shocks the conscience. *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015). As already detailed in Section II of this Response, the City knew that Officer Houser had a history of engaging violent conduct, utilizing excessive force, and disturbing issues *and* that Houser specifically targeted and threatened Decedent with the murder weapon in the weeks leading up to the shooting death.[8] The City's policies, customs, and practices increased the specific danger to Decedent, caused Decedents death, and constituted a conscious shocking failure.

---

[8] Officer Houser's employment file record is replete with additional complaints regarding Officer Houser's behavior which will require additional investigation and discovery.

The basis for the City's proposed discovery structure is to short cut and avoid Plaintiff's *Monell* discovery by (1) waiting for the Seventh Circuit's *First Midwest Bank* decision and (2) if, hypothetically, that decision goes the City's way, file a motion for summary judgment on Plaintiff's "under color of law" theory, which the City asserts might, hypothetically, end this case. (Dkt. 109, at 2). This logic, however, entirely ignores the necessary *Monell* discovery under Plaintiff's state created danger theory, including the City policies and customs relating to investigating police misconduct, preventing instances of excessive force, programs for tracking and monitoring police officers with known violent histories, mental health issues, or otherwise exhibit concerning behavior. Plaintiff submits that the City's failed policies, customs, and practices in these areas were the driving force behind Officer Houser's actions and affirmatively created or increased the danger to Decedent. Specifically, Officer Houser knew that he could continue to operate with impunity, thereby increasing the specific danger to Decedent that he exhibited a mere three weeks prior.

**B.     The Prioritization of Discovery is Not Warranted.**

The "prioritization" of discovery is not warranted in this matter. The City falsely views *First Midwest Bank* as a lynchpin whereby "wasteful spending on wide-ranging discovery [ ] may be mooted once *First Midwest Bank*" is "resolved." (Dkt. 109, p. 3). The City cursorily refers to mootness and postulates the appellate ruling could, hypothetically, cause this case to "effectively be over" (dkt. 109, p. 9) while failing to appreciate that the burden of demonstrating mootness is "a heavy one." *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979). A case only becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980). The available remedy does not need to be "fully satisfactory" to avoid mootness. *Calderon v. Moore*, 518 U.S. 149, 150 (1996). In fact, the opposite is true – "[e]ven the availability of a 'partial remedy' is 'sufficient to

prevent [a] case from being moot." *Calderon*, 518 U.S. at 150. Here, the *First Midwest Bank* matter cannot moot Plaintiff's available remedy sought against the City.

The City is wrong that structuring discovery will somehow "avoid the unnecessary expenditure of substantial costs and resources in doing [*Monell*] discovery." (Dkt. 109, p. 2). As a threshold matter, "simply postponing dispute resolution does not increase judicial efficiency." *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 431 F.Supp.2d 834, 840 (N.D. Ill. 2006); *see also Bonds v. City of Chicago*, No.16-cv-5112, 2018 WL 1316720, at *4-5 (N.D. Ill. Mar. 14, 2018) ("if bifurcation will only delay inevitable discovery disputes, it has little utility"). As recognized in *Cadiz v. Kruger*, No. 06 C 5463, 2007 WL 4293976, at *5 (N.D. Ill. Nov. 29, 2007), structuring will "create additional costs and inefficiencies without achieving any offsetting benefit."

Here, the City's vague proposal would breed inefficiencies. For example, Plaintiff would have to depose the same people twice, which is wasteful. Or if Plaintiff could only depose the various witnesses once then Plaintiff would be at a serious disadvantage. *See Bonds*, 2018 WL 1316720, at *5 ("without document discovery and one or more Rule 30(b)(6) depositions on *Monell* issues, [Plaintiff's] counsel would be at a serious disadvantage when questioning City personnel about matters relevant to her *Monell* claims"); *see also Moriarty v. LSC Illinois Corp.*, No. 98 C 7997, 1999 WL 1270711, at *4 (N.D. Ill. Dec. 29, 1999) ("this Court is mindful that the scope of discovery under Rule 26(b)(1) 'is necessarily broad in its scope in order to allow the parties equal access to the operative facts'"). Moreover, the parties will assuredly argue over and thereby litigate the application of the City's skeletal structure. *See, e.g., Trading Techs. Int'l*, 431 F. Supp.2d at 840 ("we would not be surprised if the parties engaged in extensive motion practice wrangling over whether certain pieces of discovery were applicable" to the given structured components of the case); *Estate of Loury by Hudson v. City of Chicago*, 16-cv-04452, 2017 WL

11

1425594, at *3 (N.D. Ill. April 20, 2017) ("[a]s several courts in this district have noted, forcing a court to resolve constant disputes about discovery requests' connections to *Monell* liability can introduce additional confusion to a matter and make litigation less efficient").

Further, the City offers an exaggerated conclusion as to its burdens in the case. The City suggests that responding to Plaintiff's written discovery requests "promise to take years to answer" and yet in the same breath seeks to persuade the Court that taking the depositions of a "small number" of witnesses – approximately twenty by the City's count – will "not take an inordinate amount of time." (Dkt. 109, p. 9). Similar characterizations regarding the burdens of discovery are routinely rejected. *See, e.g., Cadiz*, 2007 WL 4293976, at *3 (City saying it would have to produce thousands of documents is a non-specific assertion of burden routinely rejected); *Ricardo Rodriguez v. City of Chicago,* 429 F.Supp.3d 537, 543 (N.D. Ill. 2019) (City's assertion that it will "undergo years of discovery to analyze those [thousands] of documents is speculative at best").[9] Under the City's logic, every case should always "prioritize" discovery on, for example, liability before performing any damages discovery because if a party was not liable then the case as the City describes "could effectively be over." This is not the law. *See also Cadiz*, 2007 WL 4293976, at *3 ("if that fact alone were sufficient to require bifurcation, then bifurcation would be automatic

---

[9] Moreover, the appropriate remedy for any concern about discovery burden is not "structuring" or "prioritizing" discovery but rather a meet-and-confer and if necessary, a motion for protective order. *See, e.g., Love v. City of Chicago*, 363 F.Supp.3d 867 (N.D. Ill. 2019) ("[t]o the extent the City find Love's *Monell* discovery requests overly broad or unduly burdensome, after engaging in the required meet and confer process, the parties can seek the Court's assistance in tailoring the requests"); *Mendez v. City of Chicago*, No. 18 cv 5560, 2020 WL 1479081, at *5 (N.D. Ill. April 20, 2017) ("Defendants' concerns regarding the scope of the remaining *Monell* discovery can be addressed best through motions for protective orders"); *Moriarty*, 1999 WL 1270711, at *4 (party seeking protective order bears burden of proving good cause exists and "broad allegations of harm, unsubstantiated by specific examples or articulated reasoning do not satisfy the Rule 26(c) test") (internal quotation omitted).

and a not a matter of discretion (which it is not), and courts always would bifurcate *Monell* claims (but they do not do so)").[10]

### C. The City's Reference to Potential Indemnity Fails to Justify its Request for Structured Discovery.

The City states that "even if Houser is found to have acted within the scope and under color of law, there still will be no need for Plaintiff's *Monell* claim because under that scenario, the City will be obligated to indemnify Houser for any compensatory damages awarded…" (Dkt. 109, p. 2, 8-9). The City is gravely mistaken if it believes that Plaintiff's sole focus in pursuing this case is financial. Rather, Plaintiff looks to deter the City and effectuate change.

The City's tactic of avoiding discovery by proffering potential indemnity has tried and failed before. *See, e.g., Cadiz* 2007 WL 4293976, at *10-11(what the City is attempting to accomplish here "would allow it avoid the merits of virtually any *Monell* claim alleging police misconduct" and "the City should [not] be allowed to deprive a plaintiff of a merits determination of a *Monell* claim by the expedient of agreeing to pay a judgment against its officers that the City may be statutorily or contractually obligated to pay anyway"); *Rodriguez,* 429 F.Supp.3d at 541-42 ("Courts have reasoned there are valid non-economic reasons for pursing a *Monell* action"). Indeed, "[d]eterrence of future misconduct is a proper object of our system of tort liability" and "a finding against officers in their individual capacities does not serve all the purposes of, and is not the equivalent of, a judgment against the municipality." *Medina v. City of Chicago*, 100 F. Supp.2d 893, 897 (N.D. Ill. 2000); *see also Love*, 363 F.Supp.3d at 875-76 ("[n]on-economic reasons exist for [Plaintiff] to separately pursue her *Monell*-related claims and she should have the ability to test those claims by presenting evidence that the City's policies and procedures violated [ ]

---

[10] Tellingly, the City still seeks discovery as to Plaintiff's damages despite its contention that the *First Midwest Bank* would exculpate it from any liability. (Dkt. 109, p. 3).

13

constitutional rights"); *Mendez*, 2020 WL 1479081, at *5 ("[C]ourt agrees that offering to agree to a limited judgment should not automatically allow the City to skirt its responsibility for policies . . ."); *Cadiz*, 2007 WL 4293976, at *8-9 (rejecting any argument plaintiff does not have standing to pursue *Monell* even after achieving monetary award on individual Section 1983 claim).

### D.  The City's Suggestion that Plaintiff has Delayed *Monell* Discovery is Disingenuous.

The City incorrectly accuses Plaintiff of having "failed to conduct virtually all of" her *Monell* discovery during the stay. (Dkt. 109, p. 3). As a threshold matter, the City's Motion ignores that the Court stayed all *oral* discovery, so Plaintiff has never had the ability to conduct any oral *Monell* discovery. (Dkt. 23). Moreover, Plaintiff previously conducted written *Monell* discovery, but much like any case, will need to continue to so as the case progresses. Even as of March 20, 2019 – 26 months after the subject incident – the City justified that:

> [T]he City's investigation is still continuing; upon examining the latest group of documents received from the Police Department, the City's counsel determined there may be further documents, and so its investigation has continued. When the City believes it has completed a reasonably diligent investigation with no obvious other avenues to explore, the City will no longer say "investigation continues." Until then, forcing the City to say its investigation is complete, when it is not, is nonsensical.

(Dkt. 80, p. 10). To date, the City still says "investigation continues." Moreover, the City repeatedly refused to produce highly relevant records that have and will continue to shape the *Monell* components of this case. (Dkt. 96).[11] The need for Plaintiff to continue conducting *Monell* discovery should not be a surprise to the City. Indeed, when this Court issued the aforementioned stay, the Court referenced a prior stay in *Chagolla v. City of Chicago*, 529 F.Supp.2d 941 (N.D. Ill. 2008). (Dkt. 80-1). In *Chagolla*, the stay likewise lasted approximately two-and-half-years and

---

[11] The City's Motion solely references the original denial of Plaintiff's Motion to Compel without recognizing it was only based upon the ongoing stay of discovery promoted by the City and subsequently granted after lift of the stay. (Dkt. 109, p. 5 n. 4).

14

following the lift of the stay, the Court permitted *Monell* discovery to occur for almost another two additional years. *See Chagolla v. City of Chicago,* Dkts. 135 and 246.

The City also feigns surprise by the natural increase of the number of individuals disclosed in Plaintiff's First Amended Rule 26(a) Disclosures compared to Plaintiff's original Rule 26(a) Disclosures. (Dkt. 109, p. 6 and Dkt.109-1). However, a closer look shows that Plaintiff provided her original Rule 26(a) Disclosures the month following the shooting death of Decedent. Not surprisingly, without the aid of any discovery, Plaintiff only could identify Officer Houser and Decedent's family members. The City should understand the reality of these limitations given that one month following Plaintiff's original disclosures, the City excused its own inability to directly answer many basic allegations in the Complaint because it lacked knowledge at the time. (*See, e.g,,* Dkt. 13 ¶¶10-13). As discovery has progressed and the parties have exchanged thousands of records, the City has disclosed at least some of the identities of individuals with relevant information. For example, the City had at least ten employees involved with the December 11, 2016 incident and seventy employees involved with the January 2, 2017 incident. (Dkt. 109-1, Plaintiff's First Supplemental Rule 26(a)(1)(A)(i) Disclosures – Nos. 19-20); *see Bonds,* 2018 WL 1316720, at *5 ("lastly, but by no means least, the sheer number of witnesses involved counsels against bifurcation because 'discovery in this case will be substantial with or without discovery into the *Monell* claim'") (internal citation omitted). Moreover, due to the City's continued retention of Houser despite his numerous indiscretions and violent acts, there are likewise a large number of victims who have knowledge about Houser's pattern of wrongful conduct. (*Id.* at Nos. 13-18).

## IV.   CONCLUSION

For the reasons stated above, Plaintiff requests that the Defendant City of Chicago's Motion to Structure Discovery be denied.

Dated: June 10, 2020                                    Respectfully Submitted,

                                                        /s/      Steven A. Hart
                                                        One of the Attorneys for Plaintiff


Andrew M. Stroth
Carlton Odim
Amanda Yarusso
**ACTION INJURY LAW GROUP, LLC**
191 N. Wacker Dr., Suite 2300
Chicago, IL  60606
Tel: (312) 771-2444
astroth@actioninjurylawgroup.com
carlton@actioninjurylawgroup.com
amanda@actioninjurylawgroup.com


Steven A. Hart
Robert J. McLaughlin
Brian Eldridge
Carter Grant
John (Jack) B. Prior
**HART MCLAUGHLIN & ELDRIDGE, LLC**
22. W. Washington St., Suite 1600
Chicago, Illinois 60602
Tel: (312) 955-0545
shart@hmelegal.com
rmclaughlin@hmelegal.com
beldridge@hmelegal.com
cgrant@hmelegal.com
jprior@hmelegal.com