# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANGELICA NIEVES, as Independent Administrator of the ESTATE OF JOSE ANGEL FELIPE NIEVES, Deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 17 C 00088 |
| v. | ) ) | Honorable Matthew F. Kennelly |
| THE CITY OF CHICAGO, a Municipal Corporation; and LOWELL HOUSER, individually and as an agent of THE CITY OF CHICAGO, | ) ) ) ) ) ) | Magistrate Judge Sheila M. Finnegan **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT AT LAW

Angelica Nieves, as Independent Administrator of the Estate of Jose Angel Felipe Nieves, by and through attorneys, Action Injury Law Group, LLC and Hart McLaughlin & Eldridge, LLC, complaining of Defendants The City of Chicago, a municipal corporation and Officer Lowell Houser, individually and as an agent of The City of Chicago, states as follows:

### INTRODUCTION

1.      On January 2, 2017, Officer Lowell Houser identified himself as a Chicago Police Officer and shot and killed Jose Nieves – an unarmed, 38 year-old man. Officer Houser has been convicted of second degree murder and is incarcerated. Notwithstanding its tragic nature, this incident was entirely avoidable.

2.     On December 11, 2016 – mere weeks before Officer Houser would murder Jose outside the same address – Officer Houser identified himself as a police officer, brandished the same service weapon he would eventually use to murder Jose, and threatened Jose's life. The Chicago Police Department ("CPD") responded to the scene and investigated the occurrence and learned that Officer Houser was responsible for the armed assault on Jose. Despite this actual knowledge, the CPD engaged in an active and deliberate coverup of Officer's Houser's wrongful conduct. This shocking conduct by the CPD affirmatively caused Officer Houser to believe he could operate with impunity as he carried out his murderous actions thereby affirmatively increasing the danger Officer Houser posed to Jose.

3.     What's more, the City of Chicago had been on notice for *decades* that Officer Houser was not fit for duty and was a danger to society. Rather than permanently strip Officer Houser of his police power, the City issued proverbial slaps, emboldening Officer Houser's violent nature which tragically culminated in Jose's murder.

4.     Plaintiff seeks to hold Officer Houser personally liable for his actions, as well as the City of Chicago under various alternative theories, including (a) that Officer Houser was acting under color of law when he shot and killed Jose; (b) that the City affirmatively created and/or increased a danger to Jose– i.e. a "state created danger" theory; and (c) under a state law respondeat superior theory.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this is an action arising under 42 U.S.C. § 1983.

6.      The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims providing the basis for federal subject matter jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      The Court has personal jurisdiction over the Defendants because they are domiciled in Illinois and their conduct described herein occurred exclusively in Illinois.

8.      Venue is proper in this jurisdiction under 28 U.S.C. § 1391 because Plaintiff's injury and damages occurred in the Northern District of Illinois, Defendants reside and conduct business in the Northern District of Illinois and all events or omissions giving rise to this action occurred in the Northern District of Illinois, and this is a convenient and reasonable forum for the resolution of this dispute.

**PARTIES**

9.      Jose Nieves was 38-years old and a resident of Cook County, Illinois at the time of his murder.

10.     Angelica Nieves was appointed Independent Administrator of the Estate of Jose Angel Felipe Nieves, deceased, by the Probate Division of the Circuit Court of Cook County, Illinois. She is the sister and only sibling to Jose.

11.     Defendant City of Chicago is a municipal entity created and authorized under the laws of the State of Illinois. It is authorized under the laws of the State of Illinois to maintain a police department, the CPD, which acts as the City's agent in the area of law enforcement and for which the City is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers. The CPD's operations include the operations as described herein.

12.     Defendant Officer Lowell Houser was, at all times relevant herein, an officer, employee, and agent of the CPD, a municipal agency of the City. Officer Houser is also being sued in his individual capacity.

## FACTUAL BACKGROUND

13.     On the morning of January 2, 2017, Officer Houser identified himself as a CPD officer, removed his service weapon – the semi-automatic gun he routinely used while on patrol – from his on-duty holster, and shot CPD-issued ammunition into the back, arm and hand of Jose.

14.     Jose was unarmed and weighed 148 pounds. After nearly an hour of suffering and gasping for life, he succumbed to the gunshots and died.

15.     This case is about the death of Jose at the hands of the City, CPD and Officer Houser.

16.     The murder of Jose at the hands of Officer Houser was threatened just weeks earlier at nearly the same location. The threat became reality thanks to the CPD actively and deliberately covering-up Officer Houser's wrongful conduct and emboldening his specific targeting of Jose.

17.     On December 11, 2016, Jose reported to the CPD – multiple times – that the police officer who lived in one of the two apartments directly below him (a person whom the CPD knew to be Officer Houser) had used the eventual murder weapon to threaten Jose.

18.     Rather than acting to protect Jose from Officer Houser, the CPD engaged in an active and deliberate coverup to protect their own – Officer Houser – and emboldened Officer Houser to act on his threats and thereby foreseeably increasing the particular danger posed to Jose.

19.     Jose and the CPD knew that Officer Houser was an active danger to Jose.

20.     What Jose did not know was that the CPD knew of and facilitated Officer Houser's violent and lawless history for years prior to the threat and eventual murder of Jose.

### A. The CPD's Knowledge and Facilitation of Officer Houser's Violent and Lawless History Prior to His Threatening and Murder of Jose Nieves.

21.     Officer Houser previously had allegations *sustained* against him by the CPD for disrespect to or maltreatment due to:

   a. Grabbing and pushing his wife;

   b. Repeatedly slapping his wife in the face and head causing her to bleed;

   c. Threatening to kill his wife;

   d. Threatening to kill himself; and

   e. Choking and pushing his sister-in-law.

22.     The allegations identified in Paragraph 21 were brought against Officer Houser by his wife but she had "debated making a complaint because she was afraid he would lose his job and she was also afraid of what he would do to her." Officer Houser's wife at the time was "too afraid of her husband to seek medical treatment."

23.     Following the sustaining of the allegations identified in Paragraph 21, Officer Houser was only suspended for 20 days despite the following finding:

> It has been determined that Police Officer Houser . . . while off duty, the said member, did maltreat and show disrespect to his spouse by grabbing her by the wrists and snatched the house keys from her hands, grabbed and pushed her taking her automobile keys, repeatedly slapped her in the face and head, attempted to choke her, also refused to leave her home and did threaten to kill himself and his spouse during a domestic incident. Further, Officer Houser did maltreat a female relative when he grabbed her around the neck, choked her and pushed her against a vehicle during the same domestic incident.

24.     In a completely separate incident, Officer Houser had allegations *sustained* against him in which he battered and assaulted his ex-girlfriend – a person different than his ex-wife – including for:

a. Battering a woman by choking and dragging her, pulling her hair, throwing her across the room and banging her head on the floor resulting in the need for immediate emergency medical attention;

b. Threatening to "wipe out" the person and her family, which the person interpreted to mean "kill her and her family"; and

c. Repeatedly violating orders of protection relating to the person.

25.     The Office of Professional Standards repeatedly found Officer Houser's explanations for his conduct with his ex-girlfriend to be "not credible."

26.     Mayor Lori Lightfoot – Chief Administrator at the time – recommended that Officer Houser be suspended for a period of *fifteen days* for the incidents with his ex-girlfriend.

27.     Officer Houser appealed that fifteen-day suspension to the Discipline Screening Program. In response, Officer Houser was offered a reduced *ten day* suspension which he rejected, and the matter went to arbitration.

28.     At arbitration, the arbitrator found the statements made by Officer Houser to be "less than truthful" and "brings into question his candor." Officer Houser informed an investigator that he was "no longer being paid and was no longer a police officer" when he was actually on paid medical leave. The arbitrator noted that Officer Houser's actions caused the CPD to invest resources to resolve a situation which Officer Houser caused. Thus, Officer Houser "could be disciplined for his off-duty conduct." Notwithstanding, the suspension was reduced to *five days*.

29.     In another instance, Officer Houser had allegations *sustained* against him when he physically maltreated, grabbed, choked and pushed an 18-year old boy. The victim gave a recorded statement stating that another officer encouraged Officer Houser to "kick my ass." IPRA found that Officer Houser had an "inappropriate" response to the situation and was "outside of the use of force policy." Despite this, Officer Houser only received a suspension of three days.

30.     Next, Officer Houser had allegations *sustained* against him for an incident where he left his duty assignment at the O'Hare Airport Blue Line Platform without proper authorization and traveled to a different location where he was

accused of falsely issuing a parking ticket to a vehicle registered to a complainant's wife as part of a pattern of reprisal for an ongoing dispute between the complainant and Officer Houser's friend – a fellow CPD officer. Despite this, Officer Houser only received a one-day suspension.

31.     Officer Houser also has had allegations *sustained* against him for numerous other instances where he was violating CPD rules. This included multiple failures to follow medical roll procedures, absences without permission, failure to participate in plan of recuperation, failure to provide accurate and updated information, and failure to pay amount owed for violations. These events all led to suspensions for Officer Houser; tellingly, however, each suspension respectively lasted no more than a week.

32.     Prior to December 2016, there were at least four other instances of allegations of wrongdoing against Officer Houser that were determined by the CPD to be "unfounded" because the complainant, after reporting Officer Houser's wrongdoing to the CPD, did not then file a signed affidavit.

33.     Prior to December 2016, there have been multiple orders of protection entered against Officer Houser.

34.     Prior to December 2016, Officer Houser had violated orders of protection.

35.     Prior to December 2016, Officer Houser had at least one firearms restriction, prohibiting him from carrying a weapon.

36. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

37. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

38. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

████████████████████████████████████████████████████
████████████████████████████████

39. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████

40. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

41. ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

42. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

43. In summary, even before Officer Houser threatened Jose and murdered

him weeks later, the CPD had knowledge that Officer Houser:

a. Grabbed and pushed his wife; repeatedly slapping his wife in the face
and head causing her to bleed, threatening to kill his wife; threatened
to kill himself; choked and pushed his sister-in-law; physically dragged
his ex-girlfriend; threatened to kill his ex-girlfriend and her family;
received and repeatedly violated orders of protection; provided "not
credible" and "less than truthful" explanations for the incidents;
grabbed, chocked and pushed an 18-year old boy; acted "outside of the
use of force policy"; left his duty assignment without authority multiple
times; used his police power to harass and retaliate against a citizen
that issued a complaint against a CPD officer; repeatedly violated CPD
rules and was arrested multiple times; and

b. 

44.     Despite all of the above, in December 2016, Officer Houser remained a member of the CPD.

**B. The Proximity of Jose's and Officer Houser's residences at 2525 N. Lowell.**

45.     In December 2016, the building at 2525 N. Lowell was a two-flat property with four total units: two units on the first floor and two units on the second floor.

46.     At all relevant times, Officer Houser resided in one of the two apartments on the first floor along with his girlfriend Dianna Diaz ("Diaz") and her son Nelson Rosado ("Rosado"). Officer Houser had his own key to access the apartment.

47.     At all relevant times, Jose Nieves resided in one of the two apartments on the second floor.

48.     The apartments of Officer Houser and Jose were in close proximity to each other.

49.     Officer Houser was the only police officer that resided at 2525 N. Lowell.

**C. The December 11, 2016 Incident.**

50.     On December 11, 2016, Rosado battered Jose in the hallway of 2525 N. Lowell

51.     Officer Houser then exited his first-floor apartment carrying his service weapon: the semi-automatic pistol he uses when he is on patrol as a CPD officer.

52.     Officer Houser announced himself to Jose as a police officer.

53.     Officer Houser yelled at and intimidated Jose.

54.     Officer Houser pointed his service weapon at Jose.

55.     Officer Houser threatened harm to Jose.

56.     Jose did not know Officer Houser's name at the time, but he knew that the man holding the gun was a police officer.

57.     Jose's neighbor, a resident in the other second floor apartment, recalled that she opened her apartment door during the argument and saw Officer Houser wielding a gun. The neighbor confirmed this during her interview with IPRA.

58.     Another neighbor recalled hearing Officer Houser carrying a gun and shouting "I am the police!" That neighbor also confirmed this during her interview with IPRA.

59.     Jose called the CPD to respond to the incident.

60.     Reporting officers from the CPD arrived on scene at 2525 N. Lowell.

61.     Jose informed the responding CPD officers that a police officer living on the first floor – again, there were only two total apartments on the first floor – had threatened Jose with a gun.

62.     The responding CPD officers authored a CPD Case Supplementary Report classifying the incident as a battery. The CPD Case Supplementary identified one victim: Jose Nieves. The CPD Case Supplementary Report identified one offender: Rosado. The Case Supplementary Report made <u>no mention</u> of Officer Houser.

63.     On December 11, 2016, Jose called his mother and told her what happened. Jose said he needed to speak to his uncle, a retired CPD sergeant.

64.     Jose spoke with his uncle and informed him a "police officer just put a gun in my face; is that appropriate? Can he do that?"

65.     Jose informed his uncle that the officer had threatened to kill him. Jose informed his uncle that the officer lived in his building.

66.     Jose informed his uncle that the responding police officers didn't do anything to the police officer on the first floor when he told them about this.

67.     Jose's uncle told Jose to call the CPD back and request a supervisor.

68.     Jose's uncle confirmed what occurred, as reflected in Paragraphs 64 through 67, in an interview with IPRA.

69.     Given that the reporting officers did not address or respond to his complaint about the police officer from the first-floor apartment, Jose called the police again and requested that a supervisor from the CPD arrive on scene to address what occurred.

70.     When a responding CPD sergeant came to the scene on December 11, 2016, Jose informed the sergeant about the police officer from the first floor apartment and what had transpired.

71.     The responding CPD sergeant authored a report that focused on Jose's background and sought to incriminate Jose.

72.     Despite Jose being a victim of battery at the hands of Rosado and then the victim of assault by Officer Houser, the CPD sergeant investigated the background of Jose as opposed to Rosado or Officer Houser.

73.     The CPD sergeant's report actively and deliberated did not include the facts that the police officer from the first floor had threatened and/or pointed a gun at Jose.

74.     Furthermore, the CPD sergeant's report made no reference as to the name, background or identity of the police officer from the first-floor apartment.

75.     Rather, the report authored by the responding sergeant simply identified the "accused" as an "unknown, male, black police officer."

76.     Despite what Jose had told the responding sergeant, the officer "did not find any violations of policy per the complainant's statement . . ."

77.     Though absent from all of the CPD documentation for the incident, the responding officers *did* speak with Officer Houser at 2525 N. Lowell on December 11, 2016.

78.     Rosado saw the responding officers initiate a conversation with Houser on December 11, 2016, and Rosado heard Officer Houser identify himself as a police officer to the responding officers.

79.     While on scene on December 11, 2016, another neighbor ("Neighbor") heard the responding police officers state that "[i]t's regarding Officer Houser and the gentleman upstairs said, I guess, he pulled out a gun."

80.     The Neighbor's relative then went and brought Officer Houser to the responding police officers.

81.     The Neighbor heard the responding officers ask for Officer Houser's badge.

82.     The Neighbor saw Officer Houser having a conversation with the responding officers in the hallway.

83.     Everything contained in Paragraphs 77 through 82 were confirmed in interviews with IPRA.

84.     The night of the December 11, 2016 incident, an investigation was opened by IPRA identifying the "Accused Member" to be a "CPD Employee."

85.     Yet, less than ten hours later, IPRA determined that the incident was a "Possible Police Impersonation."

86.     Hours after determining that the incident was a "Possible Police Impersonation", the CPD administratively closed the file.

87.     There are no records whatsoever from the CPD reflecting any investigation as to the identity of the CPD officer from the first-floor apartment or any communications with or investigations into Officer Houser from the date of this incident through to the murder of Jose.

88.     Despite there only being two total apartments on the first floor, Jose's repeated complaints that a police officer from the first floor apartment had threatened him with a gun, multiple neighbors witnessing the police officer wield a gun when confronting Jose, and multiple residents witnessing the responding officers

speak to Officer Houser who identified himself as a police officer, the investigation was closed less than 18 hours after the incident with absolutely no documentation reflecting the identification of Officer Houser, any communications with Officer Houser or any investigation into Officer Houser.

89.     The officers of the CPD had multiple instances, opportunities and time for deliberation to pursue an investigation against Officer Houser, arrest him for unlawful conduct from the incident, and/or report Officer Houser to the CPD for threatening Jose with a service weapon.

90.     This was an active cover-up by the CPD and an example of the code of silence to protect a fellow CPD police officer.

91.     This wrongful and reckless conduct created the danger, increased the danger and made Jose more vulnerable to the danger that Officer Houser specifically posed to Jose.

92.     After the December 11, 2016 incident, Jose informed numerous neighbors and family members that the police officer that lived in the first-floor apartment had pulled a gun on Jose and threatened Jose. These conversations were likewise confirmed in interviews by the family members and neighbors with IPRA.

93.     Jose also told a family member that the officers that responded to the December 11, 2016 were intimidating him and threatening him. Jose said he was in fear of his life because he was afraid the police would cover up anything Officer Houser would do. These statements were all confirmed in an interview with IPRA.

94.    Indeed, 24 hours before his murder, Jose informed a neighbor that he was having problems with Officer Houser. Jose informed the neighbor that Officer Houser had previously pulled a gun on him and threatened him. This was all confirmed in an interview with IPRA.

95.    The City actively covered up Officer Houser's conduct on December 11, 2016.

96.    The City engaged in misconduct that actively and deliberately created and increased the danger to a particular and foreseeable individual: Jose.

**D. January 2, 2017 Murder.**

97.    Mere weeks later, on the morning of January 2, 2017, Officer Houser shot Jose multiple times.

98.    The shooting occurred directly outside 2525 N. Lowell Avenue – the site of the December 11, 2016 incident.

99.    Prior to shooting Jose, Officer Houser identified himself as a police officer by saying "I'm a Chicago Police Officer, I'm not about violence."

100.    Officer Houser showed Jose his star prior to the shooting; an indicia of police authority. This is also according to Officer Houser's criminal counsel's opening statement in Officer Houser's criminal trial.

101.    These actions by Officer Houser were performed by Officer Houser to invoke the real or apparent power of the CPD and perform the duties prescribed to police officers such as Officer Houser. These actions are not disconnected from the

types of services ordinarily contemplated by a police officer. Officer Houser was exercising his official authority as a police officer.

102. Jose weighed approximately 148 pounds and was unarmed.

103. Officer Houser weighed at least 200 pounds.

104. Officer Houser never saw Jose with a gun or any weapon.

105. But then Officer Houser removed his service weapon from what a fellow CPD officer would describe as "an on-duty type holster."

106. Officer Houser shot Jose in the hand, arm and back.

107. The bullets that struck Jose were "Department Issued" by the CPD.

108. After shooting Jose, Officer Houser called 9-1-1 and identified himself as a police officer.

109. Officer Houser indicated on his phone call that Jose was on the ground and bleeding, but that Jose was breathing and conscious.

110. While Jose lay on the ground fighting for his life, Officer Houser did not administer any emergency care but instead backed his car into a parking spot.

111. Officer Houser eventually returned his service weapon to his on-duty holster.

112. One witness, when interviewed by IPRA, described Jose on the ground "trying to breathe" and another witness saw Jose "gasping for air."

113. When the first responding police officer arrived on scene, Officer Houser identified himself as a police officer and approached the responding officer while displaying his star and identification – indicia of his police authority.

114.    While at the scene and speaking with fellow CPD officers, Officer Houser referenced the December 11, 2016 incident with Jose. Officer Houser said he had "gotten into it" with Jose on that date and the CPD had been called.

115.    Nearly two hours after the shooting, the CPD, for the first time, requested that Houser remove his service weapon from his on-duty holster and provide it to the CPD.

116.    The CPD's Original Case Incident Report does not identify Officer Houser's age or demographics as requested in the form. However, the Original Case Incident Report does identify him as the following: "Non-Offender", "Victim" and "Police Officer."

117.    In stark contrast, the CPD's Original Case Incident Report identified Jose as the following: "Offender" and "Suspect."

118.    The CPD's Case Supplementary Report described the incident as an aggravated assault where the victim was a Chicago Police Officer and the suspect was Jose, who the CPD identified as having "no relationship" to Officer Houser.

119.    A Records Service Division search identified the incident as "Police Shooting."

120.    A City of Chicago Office of Emergency Management & Communications Media/Data Request identified the type of incident as an aggravated assault of police officer.

121.     The CPD's Case Supplementary Report classified the incident as "Assault, Aggravated to a Police Officer" with a "Related Classification" of "Law Enforcement Related Death Investigation, Officer Involved Shooting."

122.     The CPD's Case Supplementary Report described the "Manner" as "The offender [Jose] threatens to shoot the victim [Officer] Houser."

123.     The CPD's Case Supplementary Report only identifies that Officer Houser – not Jose – had a gun.

124.     The CPD's Case Supplementary Report identifies the "Offender's Injuries" as fatal, one gunshot wound to lower left black, one gunshot wound to the upper right hand of the webbing between thumb and forefinger and ring finger, upper right arm injury, and abrasions to the left abdomen, right forehead above eye, next to the right and upper right cheek.

125.     Jose suffered three gunshot wounds and several blunt force injuries to his face, torso and left hand.

126.     One projectile entered the left side of Jose's back, perforated the skin's subcutaneous tissues and proceeded through the muscle of the abdomen adjacent to the spine and perforated the stomach, liver, paracardial sack of the heart and embedded itself in Jose's chest.

127.     While Jose was still alive, a thoracotomy incision was performed by medical personnel as they attempted to save Jose's life.

128.     Another projectile had gone through Jose's hand and struck various bones causing them to fracture, fragment and exit his skin.

129. The shooting proved to be fatal. The CPD's Original Case Incident Report indicates that the pronounced date and time of Jose's death was 9:51 a.m. – less than an hour after Officer Houser initially shot Jose.

130. Another Incident Report authored by the CPD identified the incident as "Law Enforcement Related – Death: Officer Involved Shooting" and identified the shooter by his CPD star number.

131. Days after the murder of Jose, the CPD re-opened, for the first time, the IPRA investigation as to the December 11, 2016 incident. A CPD sergeant indicated "a *short investigation* revealed no violations of department policy" and administratively closed the file – again. (emphasis added).

132. The CPD later identified the administrative closure as "in error."

### E. The Arrest, Criminal Trial and Conviction of Lowell Houser.

133. The autopsy performed on Jose determined the cause and manner of death to be "Multiple Gun Shot Wounds/Homicide."

134. On January 18, 2017 – sixteen days after Officer Houser shot and killed Jose– Officer Houser was arrested for first degree murder.

135. The Cook County State Attorney Police – Arrest Report reflects that Officer Houser stated it was the first time he had ever been arrested. In reality, Officer Houser had been arrested numerous times previously.

136. Officer Houser filed a grievance with the CPD stating that the CPD violated Article 22 of the Collective Bargaining Agreement between the City and Fraternal Order of Police by not providing him defense and indemnity when he was

acting within the scope of his employment during the incident. The grievance between Officer Houser and the CPD remains pending.

137. On or around December 13, 2019, Officer Houser was found guilty of second-degree murder.

138. On or around February 10, 2020, Officer Houser was sentenced to ten years.

139. However, per Officer Houser's counsel, Officer Houser is expected to be released by the end of 2021. Jose would have been 42 years old by the end of 2021.

### F. Police Accountability Task Force ("PATF").

140. Prior to the murder of Jose, Mayor Emanuel had established the PATF to assess the CPD.

141. Months prior to the murder of Jose, the PATF issued its report, *Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve*, with over a hundred recommendations for improving transparency and accountability (hereinafter, "PATF Report").

142. Mayor Lightfoot was the chair of the PATF.

143. The PATF was at least the sixth task force to recommend reforms to CPD.

144. The PATF Report contained findings as a result of interviews with more than 100 national and local experts:

145. The PATF Report is a "blueprint of the work necessary to reform structures that have for too long gone on unchecked and fundamentally unchanged."

146. The PATF Report included the following:

a. "Every stage of investigation and discipline is plagued by serious structural and procedural flaws that make real accountability nearly impossible";

b. "From 2011 – 2015, 40% of complaints filed were not investigated by IPRA or BIA";

c. "Even where misconduct is found to have occurred, officers are frequently able to avoid meaningful consequences due to an opaque, drawn out and unscrutinized disciplinary process";

d. "Arbitrators reduced or eliminated discipline in 73% of cases";

e. "[T]he only conclusion that can be reached is that there is no serious embrace by CPD leadership of the need to make accountability a core value. These statistics given real credibility to the widespread perception that there is a deeply entrenched code of silence supported not just by individual officers, but by the very institution itself";

f. "Chicago's police accountability system is broken . . . Cases go uninvestigated, the agency lacks resources and IPRA's findings raise troubling concerns about whether it is biased in favor of police officers";

g. "Existing policies and the woefully inadequate oversight regarding how discipline is imposed have allowed far too many officers to receive little or no discipline even after a complaint is sustained";

h. "The community's lack of trust in CPD is justified;"

i. "Chicago's police accountability system does not work";

j. "Of the 28,567 allegations of misconduct filed against CPD officers between March 11 and September 2015, only 2% of allegations result in actual discipline, after what was frequently a multi-year process";

k. "When case after high-profile case results in punishment that does not match the gravity of the misconduct, it sends a message that the police can act with impunity. It gives victims reason to question whether there is any point in reporting misconduct. It also leaves those who break the rules emboldened to continue doing so";

l. "Currently and former CPD officials also have increasingly acknowledged a 'code of silence'";

m. "[T]he code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present. The code of silence is institutionalized and reinforced by CPD rules and policies . . .";

n. "58% of the 17,700 complaints of police misconduct filed with IPRA were tagged as having 'no affidavit' and were therefore not investigated";

o. "[The ability to override the affidavit requirement] is rarely used, and not to the extent it could and should be";

p. "[I]t [is] easy for officers to lie in official reports";

q. "The tragedies and scandals involving CPD officers have consistently involved individuals and groups of officers who had amassed patterns of complaints that went unchecked and under investigated by CPD and the City. . . IPRA's failure to effectively analyze and apply its expansive knowledge of policing is a lost opportunity that perpetuates the status quo by shielding ineffective and illegal practices from scrutiny, and puts citizens at risk by allowing abusive officers to remain in the field";

r. "Shooting investigations show an institutional bias toward police. Of the 400 officer-involved shootings from 2007 (when IPRA was created) through 2014, less than 1% have been found unjustified. This number appears to be particularly troubling in light of the fact that Chicago tops big cities in fatal police-involved shootings";

s. "IPRA has failed to perform its duties as a civilian police monitor and oversight agency fairly, competently, with rigor and independence. IPRA's record of incomplete and botched investigations, such as that reflected in public reports of court findings in the recent excessive force trial involving Commander Glen Evans, coupled with its dubious track record of finding virtually every police-involved shooting of civilians to be justified – all of these factors and more have seriously undermined IPRA's effectiveness";

t. "CPD lags behind other police departments when it comes to managing risk posed by officer misconduct";

u. "[I]t is clear that some portion of the Chicago police force still is not meeting their professional and legal obligations";

v. "These current CPD accountability systems [BIS and PCP are] ineffective";

w. "[O]fficers who warrant additional attention are falling through the cracks"; and

x. "Does CPD's training need significant overhaul? The answer is yes."

### G. Department of Justice ("DOJ").

147. Eleven days after the murder of Jose – a time where Jose was still labeled the "offender" and Officer Houser labeled the "victim" – the United States Department of Justice Civil Rights Division and United States Attorney's Office Northern District of Illinois issued its report on the "Investigation of the Chicago Police Department" (hereinafter, "DOJ Report").

148. The DOJ Report contained findings as a result of the years long investigation with the aim to "conduct a thorough, independent and fair assessment of CPD's and IPRA's practices."

149. The DOJ Report was the result of the review of thousands of documents, over 300 person-days spent in Chicago, conversations with approximately a thousand community members and the assistance of attorneys, paralegals, outreach specialists, data analysts and 11 independent subject-matter experts.

150. The investigation included reviewing over 170 files related to officer-involved shootings.

151. The DOJ Report included the following:

a. "[The trust between the City and CPD] has been broken by systems that have allowed CPD officers who violate the law to escape accountability";

b. "CPD officers engage in a pattern and practice of using force, including deadly force, that is unreasonable. We found further that CPD officers' force practices unnecessarily endanger themselves and others and result in unnecessary and avoidable shootings and other uses of force";

c. "CPD has not provided officers with adequate guidance to understand how and when they may use force, or how to safely and effectively control and resolve encounters to reduce the need to use force";

d. "CPD also has failed to hold officers accountable when they use force contrary to CPD policy or otherwise commit misconduct. This failure to hold officers accountable results in some officers remaining with the Department when they should have been relieved of duty. These officers often continue their misconduct including, at times, again using unreasonably deadly force. More broadly, these failures result in officers not having the skills or tools necessary to use force wisely and lawfully, and they send a dangerous message to officers and the public that unreasonable force by CPD officers will be tolerated";

e. "We found that officers exhibit poor discipline when discharging their weapons and engage in tactics that endanger themselves and public safety";

f. "We found many circumstances in which officers' accounts of use of force incidents were later discredited, in whole or part, by video evidence. Given the numerous use-of-force incidents without video evidence . . . the pattern of unreasonable force is likely even more widespread than we were able to discern through our investigation";

g. "[M]ost officer force is not reviewed or investigated";

h. "As a result of so few force incidents being even nominally investigated, and the low quality of the force investigations that do occur, there is no meaningful, systemic accountability for officers who use force in violation of the law or CPD policy . . . The failure to review and investigate officer use of force has helped create a culture in which officers expect to use force and not be questioned about the need for propriety of that use";

i. "CPD's failure to adequately review officer use of force on a regular basis has combined with CPD's failure to properly train and supervise officers to perpetuate a pattern of unlawful use of force within CPD";

j. "The City does not investigate the majority of cases it is required by law to investigate";

k. "This failure to fully investigate almost half of all police misconduct cases seriously undermines accountability";

l. "The questioning of officers is often cursory and aimed at eliciting favorable statements justifying the officer's actions rather than seeking truth. Questioning is often marked by a failure to challenge inconsistencies and illogical officer explanations, as well as leading questions favorable to the officer";

m. "And consistent with these biased investigative techniques, the investigator's summary reports are often drafted in a manner favorable to the officer by omitting conflicts in testimony or with physical evidence that undermine the officer's justification or by exaggerating evidence favorable to the officer, all of which frustrates a reviewer's ability to evaluate for investigative quality and thoroughness";

n. "Many of the interview summaries we saw suggest the interview centered more on what the subject did to justify the officer taking action at all, rather than the circumstances of the use of force itself";

o. "Investigative fact-finding into police misconduct and attempts to hold officers accountable are also frustrated by police officers' code of silence. The City, police officers, and leadership within CPD and its police union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence";

p. "[This conduct is] causing officers to believe there is not much to lose if they lie to cover up misconduct";

q. "In the rare instances when complaints of misconduct are sustained, we found that discipline is haphazard and unpredictable, and is meted out in a way that does little to deter misconduct";

r. "The police discipline system, including the City's draft disciplinary matrix, fails to provide clear guidance on appropriate, fair, and consistent penalty ranges, thus undermining the legitimacy and deterrent effect of discipline with CPD";

s. "We found that deficiencies in officer training are exacerbated by the lack of adequate supervision CPD provides to officers in the field, which

further contributes to CPD's pattern or practice of unconstitutional policing";

t. "CPD officers engage in a pattern or practice of using force that is unjustified, disproportionate, and otherwise excessive";

u. "CPD has engaged in a pattern or practice of unreasonable force in violation of the Fourth Amendment and that the deficiencies in CPD's training, supervision, accountability, and other systems have contributed to that pattern or practice";

v. "Although a specific number of incidents and statistical evidence is not required, our investigation found that CPD officers use unnecessary and unreasonable force in violation of the Constitution with frequency, and that unconstitutional force has been historically tolerated by the CPD. This finding is based on a comprehensive investigation of CPD's force policies";

w. "Deadly force incidents have occurred when CPD officers failed to await backup and unnecessarily injected themselves into high-risk situation where there was no exigent need to do so";

x. "CPD's failure to accurately document and meaningfully review Officers' use of force perpetuates a pattern of unreasonable force";

y. "Investigations that CPD does not conduct are neither complete nor fair";

z. "CPD has not amended its policies to address the risk of officer collusion or inadvertent witness contamination";

aa. "What is clear from our investigation, however, is that a code of silence exists, and officers and community members know it. This code is apparently strong enough to incite officers to lie even when they have little to lose by telling the truth";

bb. "The City's discipline system lacks integrity and does not effectively deter misconduct";

cc. "CPD culture discourages supervisors from reporting the misconduct of subordinates";

dd. "CPD's 'early intervention system' exists in name only and does not assist supervisors in identifying or correcting problematic behavior"; and

ee. "The BIS [Behavioral Intervention System] and PCP [Personnel Concerns Program] are ineffective methods for identifying and remedying patterns of negative behavior."

### H. McGuire Woods LLP Independent Review.

152. Months later, McGuireWoods LLP issued the "Report from the Independent Audit of the Independent Police Review Authority Officer-Involved Shooting Investigations (hereinafter, "Independent Review").

153. The Independent Review contained the following as to officer-involved shootings ("OIS"):

a. "OIS review process was inadequate" and has "insufficient factual investigations" and "inadequate, and in many cases non-existent, analysis of the facts collected";

b. "Investigators failed to conduct sufficient interviews of involved officers" despite the fact "[c]omprehensive interviews of officers involved in shootings are essential to a credible review process. This is particularly true when the person who was shot has died . . ."; and

c. "[I]ssues created by failing to effectively obtain all evidence were compounded in cases where the majority of the available evidence is the officers' account of events which can go virtually unchallenged unless sufficient forensic evidence is collected."

## COUNT I
### 42 U.S.C. §1983 – Excessive Force
### Against Defendant Officer Houser

154.   Plaintiff hereby incorporates by reference Paragraphs 1 through 153 as if fully set forth herein.

155.   At all material times, Officer Houser was clothed with the authority of state law and acting under color and authority of state law as an agent and employee of the CPD.

156.   Officer Houser acted to serve his employer and exercised his official authority including stating he was trying to keep the peace; showing his badge as an indicia of policy authority; identifying himself as a police officer in order to invoke the real or apparent power of the CPD; and performing the duties prescribed for police officers and the type of services ordinarily contemplated by a police officer.

157.   At all times relevant it was the duty of Officer Houser, individually and as an officer, agent, and/or employee of the City of Chicago, to refrain from using unreasonable excessive force against others, including against Jose.

158.   On January 2, 2017, in breach of said duty, Officer Houser used unreasonable and excessive force in violation of the United States Constitution by engaging in the following acts:

   a.   Officer Houser used a level of force that Officer Houser knew or should have known was excessive when he dangerously and improperly shot Jose multiple times with bullets;

   b.   Officer Houser used excessive force in violation of the CPD's policy which expressly prohibits use of excessive force;

    c. Officer Houser failed to properly deescalate his encounter Jose prior to shooting Jose in violation of the CPD's use of force policy;

    d. Officer Houser failed to use less dangerous means of restraint on Jose before using and discharging his firearm, as Jose was not engaged in conduct that would justify such force;

    e. Officer Houser used an unreasonable amount of force despite Officer Houser's knowledge that Jose was not posing a threat of great bodily harm or death upon Officer Houser or any other person; and

    f. Officer Houser failed to follow proper procedures and adhere to a use of force continuum consistent with that used by law enforcement agencies in Illinois.

159. The aforementioned conduct of Officer Houser constituted excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

160. At all material times, Officer Houser knew that excessive force violated the Fourth and Fourteenth Amendments to the United States Constitution and imposed harm and/or risk of harm. Officer Houser had the duty to refrain from subjecting others to deprivation of those rights.

161. The aforementioned conduct of Officer Houser was objectively unreasonable.

162. The aforementioned conduct of Officer Houser was without cause or justification.

163. The aforementioned conduct of Officer Houser was so egregious that no reasonable person could have believed that it would not violate the established rights of Jose.

164.    The aforementioned conduct of Officer Houser was not rationally related to a legitimate nonpunitive governmental purpose.

165.    The aforementioned conduct of Officer Houser appeared excessive in relation to any legitimate nonpunitive governmental purpose.

166.    The aforementioned conduct of Officer Houser was applied maliciously and sadistically to cause harm.

167.    The aforementioned conduct of Officer Houser deprived Jose of his rights secured by the United States Constitution.

168.    As a proximate result of the aforementioned conduct of Officer Houser, Jose suffered loss of physical liberty, actual and extreme physical injuries, including his death, entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries included loss of constitutional and state rights, physical injuries, extraordinary pain and suffering, emotional distress and anguish, medical costs, and loss of life.

WHEREFORE, Plaintiff, Individually and as Independent Administrator of the Estate of Jose, respectfully requests that this Court enter judgment against Officer Houser and awarding compensatory damages, attorney's fees, and punitive damages, in an amount in excess of $75,000.00, and any further relief this Court deems just.

## COUNT II
### 42 U.S.C. §1983 –*Monell* Claim (Color of State Law)
### Against Defendant City of Chicago

169. Plaintiff hereby incorporates by reference Paragraphs 1 through 153 as if fully set forth herein.

170. At all material times, Officer Houser was clothed with the authority of state law and acting under color and authority of state law as an agent and employee of the CPD.

171. Officer Houser acted to serve his employer and exercised his official authority including stating he was trying to keep the peace; showing his badge as an indicia of policy authority; identifying himself as a police officer in order to invoke the real or apparent power of the CPD; and performing the duties prescribed for police officers and the type of services ordinarily contemplated by a police officer.

172. At all relevant times, Jose had a constitutional right to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

173. Jose's constitutional right to be free from excessive force was violated on January 2, 2017 when he was shot and killed by a use of excessive force.

174. Jose's constitutional right to be free from excessive force was violated by Officer Houser who was a CPD officer acting under color of state law.

175. The actions of Officer Houser were done pursuant to *de facto* policies, practices, and/or customs of the City of Chicago that so pervasive that they carry the force of law.

176.   The City of Chicago has a *de facto* policy, practice, and/or custom of maintaining a Code of Silence.

177.   The Code of Silence is an implicit understanding between and among members of the CPD resulting in a refusal to report instances of misconduct of which they are aware, including the use of unlawful force, despite their obligation to do so as sworn peace officers. This includes police officers who remain silent or give false or misleading information during official investigations into allegations of a fellow officer related to misconduct that occurred on duty or off duty to protect themselves or their fellow officers from discipline, criminal prosecution or civil liability.

178.   This *de facto* policy, practice, and/or custom involves concealing and/or suppressing officer misconduct (both on duty and off-duty misconduct), including the use of unlawful force. The concealment and suppression of the existence of misconduct includes: failure to sufficiently investigate allegations of misconduct; failure to accept complaints from citizens against police officers; the failure to investigate criminal conduct where officers are involved; failure to adequately investigate an officers' use of deadly force; failure to promptly record witness statement or preserve evidence; failure to promptly interview the suspected officer; failure to properly and sufficiently discipline an officer; fabrication of exculpatory evidence or destruction of evidence; and failure to initiate prompt disciplinary procedures related to the alleged misconduct, even when the allegation of misconduct has obvious merit.

179.   This *de facto* policy practice, and/or custom also includes defective and biased procedures for investigating use of deadly force, including excessive force.

180. This *de facto* policy practice, and/or custom also includes failing to maintain accurate and complete records of investigations of misconduct.

181. This *de facto* policy practice, and/or custom also include failing to turn over and disclose complete records of complaints and investigations of misconduct.

182. The City of Chicago acted in a manner consistent with a *de facto* policy, practice, and/or custom of a "code of silence" and "blue shield" when it engaged in conduct such as the following:

a. Emboldening Officer Houser's long history of violence against members of the public by failing to sufficiently discipline, correct, track, supervise, and monitor Officer Houser's behavior;

b. Engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by failing to sufficiently investigate Officer Houser's involvement in said incident;

c. Engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by excluding Officer Houser's name from the related reports despite having actual knowledge of his involvement;

d. Engaging in active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by failing to note Houser as suspect and/or offender during the December 11, 2016 despite having actual knowledge of Officer Houser's status as the suspect and/or offender;

e. Engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by failing to disclose CPD responding officer interviews of Officer Houser at the time and place of Officer Houser's December 11, 2016 armed assault against Jose;

f. Engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by concluding that the December 11, 2016 armed assault of Jose was the result of a "Possible Police Impersonation"

despite having actual knowledge that the offender was, in fact, Officer Houser;

g.  Engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by administratively closing the CPD's investigation of the December 11, 2016 armed assault while failing to document the identification of Officer Houser in any way, any communications with Officer Houser or any investigation into Officer Houser despite having actual knowledge of Officer Houser's involvement; and/or

h.  Further engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose, after Officer Houser made good on those threats, by characterizing Officer Houser as having "no relationship" with Jose despite having actual knowledge of Officer Houser's prior threats against Jose.

183.   The above described *de facto* policies, practices, and/or customs of the City of Chicago in maintaining a Code of Silence proximately resulted in the culture and endemic attitude among members of the CPD, including Officer Houser, that he could be abusive and engage in misconduct against citizens of Chicago with impunity and without fear of official consequence.

184.   The aforementioned *de facto* policies, practices, and/or customs of the City of Chicago has been maintained and/or implemented with utter indifference by the City of Chicago and motivated and encouraged Officer Houser to commit the aforesaid wrongful acts against Jose, and therefore were the direct and proximate cause of the injuries sustained by him.

185.   The aforementioned *de facto* policies, practices, and/or customs of the City of Chicago were the moving force behind Officer Houser's conduct depriving Jose of his Fourth and Fourteenth Amendment rights to be free from excessive force.

186.    The above acts and/or omissions of the City of Chicago violated the rights of Jose under Fourth and Fourteenth Amendments of the United States Constitution.

187.    As a direct and proximate result of the above acts and/or omissions of the City of Chicago, Jose was shot and killed on January 2, 2017.

WHEREFORE, Plaintiff, Individually and as Independent Administrator of the Estate of Jose, respectfully requests that this Court enter judgment against City of Chicago awarding compensatory damages, costs, and attorney's fees in an amount in excess of $75,000.00, and any further relief this Court deems just.

### COUNT III
### 42 U.S.C. §1983 –*Monell* Claim (State Created Danger)
### Against Defendant City of Chicago

188.    Plaintiff hereby incorporates by reference Paragraphs 1 through 153 as if fully set forth herein.

189.    At all relevant times, Jose had a constitutional right to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

190.    Jose's constitutional right to be free from excessive force was violated on January 2, 2017 when he was shot and killed by Officer Houser's use of excessive force.

191.    Officer Houser's excessive use of force was a specific danger to Jose that was actively created by the City of Chicago's misconduct and failures and constituted a state created danger.

192. The danger created by the City of Chicago's misconduct and failures affirmatively placed Jose in a position of danger that he otherwise would not have faced.

193. The City of Chicago created and/or substantially contributed to the creation of a danger and rendered Jose more vulnerable to danger than he would otherwise have been.

194. The City of Chicago turned a potential danger for Jose into an actual one. The City of Chicago's acts endangered Jose and put him in worse position.

195. The City of Chicago's affirmative acts created and/or increased the danger to a particular, foreseeable individual: Jose.

196. The danger created by the City of Chicago's misconduct and failures was the proximate cause of his injuries and death.

197. The City of Chicago actively created this danger Officer Houser imposed through its *de facto* policies, practices, and/or customs that were so pervasive that they carry the force of law.

198. The City of Chicago has a *de facto* policy, practice, and/or custom of maintaining a Code of Silence.

199. The Code of Silence is an implicit understanding between and among members of the CPD resulting in a refusal to report instances of misconduct of which they are aware, including the use of unlawful force, despite their obligation to do so as sworn peace officers. This include police officers who remain silent or give false or misleading information during official investigations into allegations of a fellow

officer related to misconduct that occurred on duty or off duty to protect themselves or their fellow officers from discipline, criminal prosecution or civil liability.

200. This *de facto* policy, practice, and/or custom involves concealing and/or suppressing officer misconduct (both on duty and off-duty misconduct), including the use of unlawful force. The concealment and suppression of the existence of misconduct includes: failure to sufficiently investigate allegations of misconduct; failure to accept complaints from citizens against police officers; the failure to investigate criminal conduct where officers are involved; failure to adequately investigate an officers' use of deadly force; failure to promptly record witness statement or preserve evidence; failure to promptly interview the suspected officer; failure to properly and sufficiently discipline an officer; fabrication of exculpatory evidence or destruction of evidence; and failure to initiate prompt disciplinary procedures related to the alleged misconduct, even when the allegation of misconduct has obvious merit.

201. This *de facto* policy practice, and/or custom also includes defective and biased procedures for investigating use of deadly force, including excessive force.

202. This *de facto* policy practice, and/or custom also includes failing to maintain accurate and complete records of investigations of misconduct.

203. This *de facto* policy practice, and/or custom also include failing to turn over and disclose complete records of complaints and investigations of misconduct.

204. The City of Chicago acted in a manner consistent with a *de facto* policy, practice, and/or custom of a "code of silence" and "blue shield" when it engaged in active and deliberate misconduct such as the following:

a. Emboldening Officer Houser's long history of abuse and violence against members of the public by failing to sufficiently discipline, correct, track, and monitor Officer Houser's behavior;

b. Engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by actively and deliberately failing to sufficiently investigate Officer Houser's involvement in said incident;

c. Engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by excluding Officer Houser's name from the related reports despite having actual knowledge of his involvement;

d. Engaging in active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by failing to note Houser as suspect and/or offender during the December 11, 2016 despite having actual knowledge of Officer Houser's status as the suspect and/or offender;

e. Engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by actively and deliberately failing to disclose CPD responding officer interviews of Officer Houser at the time and place of Officer Houser's December 11, 2016 armed assault against Jose;

f. Engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by falsely concluding that the December 11, 2016 armed assault of Jose was the result of a "Possible Police Impersonation" despite having actual knowledge that the offender was, in fact, Officer Houser;

g. Engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose in which Officer Houser threatened to kill Jose with his firearm by administratively closing the CPD's investigation of the December 11, 2016 armed assault while actively and deliberately failing to document the identification of Officer Houser in any way, any communications with Officer Houser or any investigation into Officer Houser despite having actual knowledge of Officer Houser's involvement; and/or

h. Further engaging in an active cover-up of Officer Houser's December 11, 2016 armed assault against Jose, after Officer Houser made good on

those threats, by characterizing Officer Houser as having "no relationship" with Jose despite having actual knowledge of Officer Houser's prior threats against Jose.

205.    The above-described actions and failures proximately caused Jose's murder and shock the conscience.

206.    The above-described actions by City were not indifference or inaction but rather active, deliberate and affirmative acts creating or increasing danger to Jose.

207.    The above-described *de facto* policies, practices, and/or customs of the City of Chicago in maintaining a Code of Silence proximately resulted in the culture and endemic attitude among members of the CPD, including Officer Houser, that he could engage in misconduct against citizens of Chicago with impunity and without fear of official consequence.

208.    The aforementioned *de facto* policies, practices, and/or customs of the City of Chicago has been maintained and/or implemented with utter indifference by the City of Chicago and motivated and encouraged Officer Houser to commit the aforesaid wrongful acts against Jose, and therefore were the direct and proximate cause of the injuries sustained by him.

209.    The aforementioned *de facto* policies, practices, and/or customs of the City of Chicago were the moving force behind Officer Houser's conduct depriving Jose of his Fourth and Fourteenth Amendment rights to be free from excessive force.

210.     The above acts and/or omissions of the City of Chicago violated the rights of Jose under Fourth and Fourteenth Amendments of the United States Constitution.

211.     As a direct and proximate result of the above acts and/or omissions of the City of Chicago, Jose was shot and killed on January 2, 2017.

WHEREFORE, Plaintiff, Individually and as Independent Administrator of the Estate of Jose, respectfully requests that this Court enter judgment against City of Chicago  and awarding compensatory damages, costs, and attorney's fees in an amount in excess of $75,000.00, and any further relief this Court deems just.

## COUNT IV
### Wrongful Death – Negligence
### Against Officer Houser

212.     Plaintiffs hereby incorporate by reference Paragraphs 1 through 153 as if fully set forth herein.

213.     At all material times, Officer Houser was clothed with the authority of state law and acting under color and authority of state law as an agent and employee of the CPD.

214.     Officer Houser acted to serve his employer and exercised his official authority including stating he was trying to keep the peace; showing his badge as an indicia of policy authority; identifying himself as a police officer in order to invoke the real or apparent power of the CPD; and performing the duties prescribed for police officers and the type of services ordinarily contemplated by a police officer.

215. On January 2, 2017, Officer Houser, engaged in excessive, unreasonable, and dangerous physical force against Jose.

216. On January 2, 2017, and at all relevant times, Officer Houser had a duty to refrain from unreasonable conduct which would endanger the safety of others.

217. Notwithstanding his duties, Officer Houser was negligent in one or more of the following ways:

   a. Officer Houser dangerously and improperly shot Jose multiple times with bullets from his firearm;

   b. Officer Houser used a level of force that Officer Houser knew, or should have known was excessive under the circumstances;

   c. Officer Houser used an unreasonable amount of force in relationship to the threat posed by Jose;

   d. Officer Houser failed to use less dangerous means of force on Jose before using and discharging his firearm as Jose was not engaged in conduct that would justify such force;

   e. Officer Houser used an unreasonable amount of force despite Officer Houser's knowledge that Jose was not posing a threat of great bodily harm or death upon Officer Houser or any other person; and/or

   f. Was otherwise negligent.

218. As a direct and proximate result of these negligent acts and/or omissions, Jose suffered serious injuries which resulted in his death.

219. At the time of his death, Jose was survived by his heirs and next-of-kin.

220. Jose's heirs and next-of-kin were dependent upon Jose's services, support, society, companionship, love and affection, during and for the expected remainder of his life, of which they were deprived as a direct and proximate result of Jose's death.

221. As a further direct and proximate result of Jose's death, Jose's heirs and next-of-kin were caused to experience substantial grief, sorrow, and mental suffering.

222. Due to these negligent acts and/or omissions, Officer Houser is liable to Plaintiff for the death of Jose and the loses sustained by his heirs pursuant to 740 ILCS 180/1, commonly referred to as the Wrongful Death Act.

WHEREFORE, Plaintiff, Individually and as Independent Administrator of the Estate of Jose, respectfully requests that this Court enter judgment against Officer Houser and awarding compensatory damages in an amount in excess of $50,000.00, and any further relief this Court deems just.

**<u>COUNT V</u>**
**Wrongful Death – Willful and Wanton**
**Against Officer Houser, individually and as agent**

223. Plaintiffs hereby incorporate by reference Paragraphs 1 through 153 as if fully set forth herein.

224. At all material times, Officer Houser was clothed with the authority of state law and acting under color and authority of state law as an agent and employee of the CPD.

225. Officer Houser acted to serve his employer and exercised his official authority including stating he was trying to keep the peace; showing his badge as an indicia of policy authority; identifying himself as a police officer in order to invoke the real or apparent power of the CPD; and performing the duties prescribed for police officers and the type of services ordinarily contemplated by a police officer.

226.     On January 2, 2017, Officer Houser, acting as a duly authorized agent of the City of Chicago engaged in excessive, unreasonable, and dangerous physical force against Jose.

227.     On January 2, 2017, and at all relevant times, Officer Houser had a duty to refrain from willful and wanton misconduct, including the use of excessive force during the performance of his duties as a police officer.

228.     Notwithstanding his duties, Officer Houser committed willful and wanton misconduct in one or more of the following ways:

    a. With an utter indifference and conscious disregard for Jose's safety, Officer Houser dangerously and improperly shot Jose multiple times with bullets from his firearm;

    b. With an utter indifference and conscious disregard for Jose's safety, Office Houser used a level of force that Officer Houser knew, or should have known was excessive under the circumstances;

    c. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used an unreasonable amount of force in relationship to the threat posed by Jose;

    d. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used excessive force in violation of the CPD's policy which expressly prohibits use of excessive force;

    e. With an utter indifference and conscious disregard for Jose's safety, Officer Houser failed to use less dangerous means of force on Jose before using and discharging his firearm as Jose was not engaged in conduct that would justify such force;

    f. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used an unreasonable amount of force despite Officer Houser's knowledge that Jose was not posing a threat of great bodily harm or death upon Officer Houser or any other person; and/or

    g. Was otherwise willful and wanton

229.     As a direct and proximate result of these willful and wanton acts and/or omissions, Jose suffered serious injuries which resulted in his death.

230.     At the time of his death, Jose was survived by his heirs and next-of-kin.

231.     Jose's heirs and next-of-kin were dependent upon Jose's services, support, society, companionship, love and affection, during and for the expected remainder of his life, of which they were deprived as a direct and proximate result of Jose's death.

232.     As a further direct and proximate result of Jose's death, Jose's heirs and next-of-kin were caused to experience substantial grief, sorrow, and mental suffering.

233.     Due to these willful and wanton acts and/or omissions, Officer Houser is liable to Plaintiff for the death of Jose and the loses sustained by his heirs pursuant to 740 ILCS 180/1, commonly referred to as the Wrongful Death Act.

WHEREFORE, Plaintiff, Individually and as Independent Administrator of the Estate of Jose, respectfully requests that this Court enter judgment against Officer Houser and awarding compensatory damages in an amount in excess of $50,000.00, and any further relief this Court deems just.

**COUNT VI**
**Wrongful Death – Respondeat Superior**
**Against City of Chicago**

234.     Plaintiffs hereby incorporate by reference Paragraphs 1 through 153 as if fully set forth herein.

235. At all material times, Officer Houser was clothed with the authority of state law and acting under color and authority of state law as an agent and employee of the CPD.

236. Officer Houser acted to serve his employer and exercised his official authority including stating he was trying to keep the peace; showing his badge as an indicia of policy authority; identifying himself as a police officer in order to invoke the real or apparent power of the CPD; and performing the duties prescribed for police officers and the type of services ordinarily contemplated by a police officer.

237. On January 2, 2017, Officer Houser, acting as a duly authorized agent of the City of engaged in excessive, unreasonable, and dangerous physical force against Jose.

238. On January 2, 2017, and at all relevant times, the City, by and through its employees and agents, had a duty to refrain from willful and wanton misconduct, including the use of excessive force during the performance of his duties as a police officer.

239. Notwithstanding its duty, the City of Chicago, by and through its agents, employees, and officers committed willful and wanton misconduct in one or more of the following ways:

   a. With an utter indifference and conscious disregard for Jose's safety, Officer Houser dangerously and improperly shot Jose multiple times with bullets from his firearm;

   b. With an utter indifference and conscious disregard for Jose's safety, Office Houser used a level of force that Officer Houser knew, or should have known was excessive under the circumstances;

c. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used an unreasonable amount of force in relationship to the threat posed by Jose;

d. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used excessive force in violation of the CPD's policy which expressly prohibits use of excessive force;

e. With an utter indifference and conscious disregard for Jose's safety, Officer Houser failed to use less dangerous means of force on Jose before using and discharging his firearm as Jose was not engaged in conduct that would justify such force;

f. With an utter indifference and conscious disregard for Jose's safety, Defendant City of Chicago failed to implement and adhere to a use of force continuum consistent with that used by law enforcement agencies in Illinois;

g. With an utter indifference and conscious disregard for Jose's safety, Defendant City of Chicago failed to properly instruct, train, and implement sufficient use of force policy continuum, consistent with that used by law enforcement agencies in Illinois;

h. With an utter indifference and conscious disregard for Jose's safety, Defendant City of Chicago failed to properly monitor, track, surveil, and discipline Officer Houser despite knowing, or should have knowing, that Officer Houser posed an actual danger to Jose; and

i. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used an unreasonable amount of force despite Officer Houser's knowledge that Decedent was not posing a threat of great bodily harm or death upon Officer Houser or any other person.

240. In the course of the aforementioned willful and wanton acts and omissions, Officer Houser was acting within the course and scope of his employment with the City of Chicago Police Department, and thus the City of Chicago is liable based on the theory of respondeat superior.

241. As a direct and proximate result of these willful and wanton acts and/or omissions, Jose suffered serious injuries which resulted in his death.

242. At the time of his death, Jose was survived by his heirs and next-of-kin.

243. Jose's heirs and next-of-kin were dependent upon Jose's services, support, society, companionship, love and affection, during and for the expected remainder of his life, of which they were deprived as a direct and proximate result of Jose's death.

244. As a further direct and proximate result of Jose's death, Jose's heirs and next-of-kin were caused to experience substantial grief, sorrow, and mental suffering.

245. Due to these willful and wanton acts and/or omissions, the City is liable to Plaintiff for the death of Jose and the loses sustained by his heirs pursuant to 740 ILCS 180/1, commonly referred to as the Wrongful Death Act.

WHEREFORE, Plaintiff, Individually and as Independent Administrator of the Estate of Jose, respectfully requests that this Court enter judgment against the City of Chicago and awarding compensatory damages in an amount in excess of $50,000.00, and any further relief this Court deems just.

## COUNT VII
### Survival Action - Negligence
### Against Officer Houser

246. Plaintiffs hereby incorporate by reference Paragraphs 1 through 153 as if fully set forth herein.

247. At all material times, Officer Houser was clothed with the authority of state law and acting under color and authority of state law as an agent and employee of the CPD.

248.    Officer Houser acted to serve his employer and exercised his official authority including stating he was trying to keep the peace; showing his badge as an indicia of policy authority; identifying himself as a police officer in order to invoke the real or apparent power of the CPD; and performing the duties prescribed for police officers and the type of services ordinarily contemplated by a police officer.

249.    Plaintiff, as Independent Administrator of the Estate of Jose, brings this action pursuant to the provisions of 755 ILCS 5/27-6, commonly known as the Illinois Survival Statute.

250.    On January 2, 2017, Officer Houser engaged in excessive, unreasonable, and dangerous physical force against Jose.

251.    On January 2, 2017, and at all relevant times, Officer Houser had a duty to refrain from unreasonable conduct which would endanger the safety of others.

252.    Notwithstanding his duties, Officer Houser was negligent in one or more of the following ways:

    a.  Officer Houser dangerously and improperly shot Jose multiple times with bullets from his firearm;

    b.  Officer Houser used a level of force that Officer Houser knew, or should have known was excessive under the circumstances;

    c.  Officer Houser used an unreasonable amount of force in relationship to the threat posed by Jose;

    d.  Officer Houser failed to use less dangerous means of force on Jose before using and discharging his firearm as Jose was not engaged in conduct that would justify such force;

    e.  Officer Houser used an unreasonable amount of force despite Officer Houser's knowledge that Jose was not posing a threat of great bodily harm or death upon Officer Houser or any other person; and/or

f. Was otherwise negligent.

253. As a direct and proximate result of these negligent acts and/or omissions, Jose suffered damages including physical and emotional injuries, medical expenses, and conscious pain and suffering.

254. As a direct and proximate result of these negligent acts and/or omissions, Jose suffered serious injuries which resulted in his death.

255. As a direct and proximate result of Defendant's willful and wanton acts, Jose suffered injuries of a personal and pecuniary nature, including disability, disfigurement, pain and suffering, emotional trauma, and bodily injuries for which Jose would have been entitled to receive compensation from the Defendant had he survived.

WHEREFORE, Plaintiff, Individually and as Independent Administrator of the Estate of Jose, respectfully requests that this Court enter judgment against Officer Houser and awarding compensatory damages in an amount in excess of $50,000.00, and any further relief this Court deems just.

**COUNT VIII**
**Survival Action – Willful and Wanton**
**Against Officer Houser**

256. Plaintiffs hereby incorporate by reference Paragraphs 1 through 153 as if fully set forth herein.

257. Plaintiff, as Independent Administrator of the Estate of Jose, brings this action pursuant to the provisions of 755 ILCS 5/27-6, commonly known as the Illinois Survival Statute.

258.   At all material times, Officer Houser was clothed with the authority of state law and acting under color and authority of state law as an agent and employee of the CPD.

259.   Officer Houser acted to serve his employer and exercised his official authority including stating he was trying to keep the peace; showing his badge as an indicia of policy authority; identifying himself as a police officer in order to invoke the real or apparent power of the CPD; and performing the duties prescribed for police officers and the type of services ordinarily contemplated by a police officer.

260.   On January 2, 2017, Officer Houser, acting as a duly authorized agent of the City of engaged in excessive, unreasonable, and dangerous physical force against Jose.

261.   On January 2, 2017, and at all relevant times, Officer Houser had a duty to refrain from willful and wanton misconduct, including the use of excessive force during the performance of his duties as a police officer.

262.   Notwithstanding Officer Houser committed willful and wanton misconduct in one or more of the following ways:

   a. With an utter indifference and conscious disregard for Jose's safety, Officer Houser dangerously and improperly shot Jose multiple times with bullets from his firearm;

   b. With an utter indifference and conscious disregard for Jose's safety, Office Houser used a level of force that Officer Houser knew, or should have known was excessive under the circumstances;

   c. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used an unreasonable amount of force in relationship to the threat posed by Jose;

d. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used excessive force in violation of the CPD's policy which expressly prohibits use of excessive force;

e. With an utter indifference and conscious disregard for Jose's safety, Officer Houser failed to use less dangerous means of force on Jose before using and discharging his firearm as Jose was not engaged in conduct that would justify such force;

f. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used an unreasonable amount of force despite Officer Houser's knowledge that Decedent was not posing a threat of great bodily harm or death upon Officer Houser or any other person; and/or

g. Was otherwise willful and wanton.

263. As a direct and proximate result of these willful and wanton acts and/or omissions, Jose suffered damages including physical and emotional injuries, medical expenses, and conscious pain and suffering.

264. As a direct and proximate result of these willful and wanton acts and/or omissions, Jose suffered serious injuries which resulted in his death.

265. As a direct and proximate result of Defendant's willful and wanton acts, Jose suffered injuries of a personal and pecuniary nature, including disability, disfigurement, pain and suffering, emotional trauma, and bodily injuries for which Jose would have been entitled to receive compensation from the Defendant had he survived.

WHEREFORE, Plaintiff, Individually and as Independent Administrator of the Estate of Jose, respectfully requests that this Court enter judgment against Officer Houser and awarding compensatory damages in an amount in excess of $50,000.00, and any further relief this Court deems just.

**Survival Action – Respondeat Superior**
**Against City of Chicago**

266.   Plaintiffs hereby incorporate by reference Paragraphs 1 through 153 as if fully set forth herein.

267.   Plaintiff, as Independent Administrator of the Estate of Jose, brings this action pursuant to the provisions of 755 ILCS 5/27-6, commonly known as the Illinois Survival Statute.

268.   At all material times, Officer Houser was clothed with the authority of state law and acting under color and authority of state law as an agent and employee of the CPD.

269.   Officer Houser acted to serve his employer and exercised his official authority including stating he was trying to keep the peace; showing his badge as an indicia of policy authority; identifying himself as a police officer in order to invoke the real or apparent power of the CPD; and performing the duties prescribed for police officers and the type of services ordinarily contemplated by a police officer.

270.   On January 2, 2017, Officer Houser, acting as a duly authorized agent of the City of engaged in excessive, unreasonable, and dangerous physical force against Jose.

271.   On January 2, 2017, and at all relevant times, the City, by and through its employees and agents, had a duty to refrain from willful and wanton misconduct, including the use of excessive force during the performance of his duties as a police officer.

272. Notwithstanding its duty, the City of Chicago, by and through its agents, employees, and officers committed willful and wanton misconduct in one or more of the following ways:

a. With an utter indifference and conscious disregard for Jose's safety, Officer Houser dangerously and improperly shot Jose multiple times with bullets from his firearm;

b. With an utter indifference and conscious disregard for Jose's safety, Office Houser used a level of force that Officer Houser knew, or should have known was excessive under the circumstances;

c. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used an unreasonable amount of force in relationship to the threat posed by Jose;

d. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used excessive force in violation of the CPD's policy which expressly prohibits use of excessive force;

e. With an utter indifference and conscious disregard for Jose's safety, Officer Houser failed to use less dangerous means of force on Jose before using and discharging his firearm as Jose was not engaged in conduct that would justify such force;

f. With an utter indifference and conscious disregard for Jose's safety, Defendant City of Chicago failed to implement and adhere to a use of force continuum consistent with that used by law enforcement agencies in Illinois;

g. With an utter indifference and conscious disregard for Jose's safety, Defendant City of Chicago failed to properly instruct, train, and implement sufficient use of force policy continuum, consistent with that used by law enforcement agencies in Illinois;

h. With an utter indifference and conscious disregard for Jose's safety, Defendant City of Chicago failed to properly monitor, track, surveil, and discipline Officer Houser despite knowing, or should have knowing, that Officer Houser posed an actual danger to Jose; and

i. With an utter indifference and conscious disregard for Jose's safety, Officer Houser used an unreasonable amount of force despite Officer

Houser's knowledge that Decedent was not posing a threat of great bodily harm or death upon Officer Houser or any other person.

273.    In the course of the aforementioned willful and wanton acts and omissions, Officer Houser was acting within the course and scope of his employment with the City of Chicago Police Department, and thus the City of Chicago is liable based on the theory of respondeat superior.

274.    As a direct and proximate result of these willful and wanton acts and/or omissions, Jose suffered serious injuries which resulted in his death.

275.    As a direct and proximate result of Defendant's willful and wanton acts, Jose suffered injuries of a personal and pecuniary nature, including disability, disfigurement, pain and suffering, emotional trauma, and bodily injuries for which Jose would have been entitled to receive compensation from the Defendant had he survived.

WHEREFORE, Plaintiff, Individually and as Independent Administrator of the Estate of Jose, respectfully requests that this Court enter judgment against the City of Chicago and awarding compensatory damages in an amount in excess of $50,000.00, and any further relief this Court deems just.

## COUNT X
### Indemnification

276.    Each of the foregoing paragraphs are incorporated herein as if fully restated.

277.    Defendant City of Chicago was the employer of Defendant Officer Lowell Houser at all times relevant to the allegations contained in this complaint.

278. Defendant Officer Lowell Houser committed the acts alleged in this complaint under the color of law and in the scope of his employment as an employee of the City of Chicago, and the City is liable for their actions under 745 ILCS 10/9-102.

WHEREFORE, Plaintiff, Individually and as Independent Administrator of the Estate of Jose, respectfully requests that this Court enter judgment against the City of Chicago and awarding compensatory damages in an amount in excess of $50,000.00, and any further relief this Court deems just.

## JURY DEMAND

Plaintiff demands a trial by jury in this action on each and every one of her claims.

Dated: April 15, 2021                    Respectfully Submitted,

                                         /s/      Andrew M. Stroth
                                         One of the Attorneys for Plaintiff


Andrew M. Stroth
Carlton Odim
**ACTION INJURY LAW GROUP, LLC**
191 N. Wacker Dr., Suite 2300
Chicago, IL  60606
Tel: (312) 771-2444
astroth@actioninjurylawgroup.com
carlton@actioninjurylawgroup.com

Steven A. Hart
Robert J. McLaughlin
Brian Eldridge
Carter Grant
John (Jack) B. Prior
**HART MCLAUGHLIN & ELDRIDGE, LLC**
22. W. Washington St., Suite 1600
Chicago, Illinois 60602
Tel: (312) 955-0545
shart@hmelegal.com
rmclaughlin@hmelegal.com
beldridge@hmelegal.com
cgrant@hmelegal.com
jprior@hmelegal.com